STEVEN KALAR
Federal Public Defender
SOPHIA WHITING
Assistant Federal Public Defender
450 Golden Gate Avenue
San Francisco, California  94102
Telephone:   (415) 436-7700
Facsimile:    (415) 436-7706
Email:          Sophia_Whiting@fd.org

Counsel for Defendant LUISA-ORTEGA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| UNITED STATES OF AMERICA, | **Case No.:** CR 19-485 EMC |
|---|---|
| Plaintiff, | **SENTENCING MEMORANDUM** |
| v. | |
| RAUL LUISA-ORTEGA, | |
| Defendant. | |

On December 16, 2019, Raul Luisa-Ortega accepted responsibility for selling $16 worth of crack cocaine to an undercover police officer. Mr. Luisa-Ortega deeply regrets becoming involved in drugs, which has destroyed his ability to support his family in Honduras and any hope for a future he had in this country. Because of Mr. Luisa-Ortega's incredibly difficult background, his own drug addiction, and his inevitable deportation, Mr. Luisa-Ortega respectfully requests that the Court vary downward under the factors of 18 U.S.C. § 3553(a) from the U.S. Sentencing Guideline range of 6 to 12 months and impose upon him a sentence of time served (effectively 3 months imprisonment).

**BACKGROUND**

Raul Luisa-Ortega was born on October 21, 1990, and grew up in a village in Honduras. After attending school through only the third grade, Mr. Luisa-Ortega began working to support his family. The only consistent work available was, and still is, manual labor in the fields. Honduras was, and still is, plagued by corruption and violence. The capital city has become one of the most violent cities in the world. *See, e.g.,* Central America Refugee Crisis, UNITED NATIONS REFUGEE AGENCY (available at https://www.unrefugees.org/emergencies/central-america).

This climate led to the murder of Mr. Luisa-Ortega's father, with no repercussion to the murderers. When asked whether the police helped his family, Mr. Luisa-Ortega chuckled solemnly and shook his head, eyes downcast. He said, no, you don't understand. In Honduras, the police aren't like they are here. The police will not help us.

Worried that he would be the next target of this violence, and hoping to be able to provide some financial support to his family, Mr. Luisa-Ortega decided to make the dangerous journey north, aspiring to find employment and refuge.

When Mr. Luisa-Ortega arrived in the United States, he pursued gainful employment as a day laborer, taking on construction jobs as he could find them. But without an education, steady income, stable living situation, or many contact in the Bay Area, Mr. Luisa-Ortega made the regrettable decision to get involved in drugs—both personal use and small hand-to-hand sales. Despite his marijuana and methamphetamine abuse, and living a mostly transient life, Mr. Luisa-Ortega still managed to keep daily contact with his mother and send home some money to her and his young daughter, who still lives in Honduras.

On September 13, 2019, Mr. Luisa-Ortega made the regrettable decision to sell $16 worth of crack cocaine to an undercover police officer in the Tenderloin. When officers searched him, they found a single individual twist of heroin in his sweatshirt pocket. After confirming his identity at the Police Station, San Francisco Police Officers cited and released Mr. Luisa-Ortega. Since he happened to be cited after the government began their Federal Initiative for The Tenderloin ("FITT"), on September 26, 2019, the government filed a federal

indictment charging Mr. Luisa-Ortega with 21 U.S.C. § 841(a)(1) and (b)(1)(C), drug distribution. On October 6, 2019, Mr. Luisa-Ortega was arrested on the street on the federal warrant. He was arraigned the following day.

## DISCUSSION

### A. The Sentencing Guidelines (18 U.S.C. § 3553(a)(4))

Mr. Luisa-Ortega agrees with the government that the applicable U.S. Sentencing Guideline range is 6 to 12 months, based upon Offense Level 10 and Criminal History Category I, in Zone B of the Sentencing Table. Since the applicable guideline range is in Zone B of the Sentencing Table, the Court may impose probation with a condition or combination of conditions requiring intermittent confinement, community confinement, or home detention. U.S.S.G. § 5C1.1(c)(3). However, as Mr. Luisa-Ortega does not have permission to be in this country, he is not eligible for any of those preferable alternatives to imprisonment expressly recognized in the guidelines.

Instead, under the factors of 18 U.S.C. § 3553(a), Mr. Luisa-Ortega respectfully requests that the Court vary downward from the low end of the advisory guideline range to a sentence of "time served" (effectively three months imprisonment) due to the difficult conditions in Honduras, and his specific family trauma, which led Mr. Luisa-Ortega to seek employment here in the United States, as well as the reality that Mr. Luisa-Ortega will be detained by immigration officials and deported.

Although the court must remain mindful of the Guideline recommendation, the range established by the Sentencing Guidelines is not presumptively reasonable and it cannot be given any more or less weight than any other factor listed in section 3553(a). *United States v. Autery*, 555 F.3d 864, 872 (9th Cir. 2009); *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The court's paramount concern must be to "'impose a sentence sufficient, but not greater than necessary' to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other

correctional treatment." *Carty*, 520 F.3d at 991.

Mr. Luisa-Ortega contends for the reasons below that a sentence of time served better aligns with the goals and factors of section 3553(a).

**I. The Nature and Circumstances of the Offense and History and Characteristics of Mr. Luisa-Ortega Warrant a Sentence of Credit for Time Served (18 U.S.C. § 3553(a)(1))**

As set forth in the Background section above, Mr. Luisa-Ortega first came to the United States from Honduras, because the violence there killed his father and has eliminated any realistic opportunity of gainful employment, apart from working in the fields. Although this fact does not excuse Mr. Luisa-Ortega's criminal conduct, it does provide an important perspective, especially when considering the role in creating those violent conditions in Honduras played by the same federal government prosecuting him here.

Honduras is a dangerous and violent country with one of the highest murder rates in the world. *See* Honduras 2018 Crime & Safety Report, OVERSEAS SECURITY ADVISORY COUNCIL (available at https://www.osac.gov/Pages/ContentReportDetails.aspx?cid =23798) [hereinafter 2018 Crime & Safety Report]; *see also* Gangs in Honduras, INSIGHT CRIME (available at https://www.insightcrime.org/images/PDFs/2015/HondurasGangs.pdf) [hereinafter Gangs in Honduras] at 1 ("In 2014, Honduras was considered the most violent nation in the world that was not at war."). Tegucigalpa, the capital of Honduras, and San Pedro Sula, the country's economic center, are two of the ten most dangerous cities in the world. Central America Refugee Crisis, UNITED NATIONS REFUGEE AGENCY (available at https://www.unrefugees.org/emergencies/central-america/); *see also* Gangs in Honduras at 1. According to the 2017 State Department Human Rights Report, violence in Honduras includes "murder, extortion, kidnapping, torture, human trafficking, intimidation, and other threats . . . ." Country Report of Human Rights Practices for 2017, Honduras, U.S. DEP'T OF STATE, BUREAU OF DEMOCRACY, HUMAN RIGHTS AND LABOR (available at https://www.state.gov/documents/organization/277585.pdf) at 1.

Although there are many reasons for the high crime and murder rates, political instability and gang activity have contributed to the violence for decades. In the 1980's, the

1  United States used Honduras to base American soldiers as they fought against the Nicaraguan
2  government. *Id.* Neighboring countries Guatemala and El Salvador, also endured internal wars
3  that left the countries unstable. *Id.* Because many were left unemployed and weapons were
4  readily available, criminal groups began to form throughout Central America. *Id.* According to
5  the Wilson Center, and as directly experienced by Mr. Luisa-Ortega, crime generally goes
6  unreported because of corruption, weak law enforcement, and active criminal groups. *See*
7  Cristina Eguizábal et al., Crime and Violence in Central America's Northern Triangle,
8  WILSON CTR RPT. ON AMERICAS (available at
9  https://www.wilsoncenter.org/sites/default/files/FINAL%20PDF_CARSI%20REPORT_0.pdf
10 [hereinafter Crime and Violence] at 1-2. In 2009, a military coup ousted Honduras President
11 Zelaya making Honduras the first Central American country to undergo a coup in nearly two
12 decades, and in 2017, the most recent Honduran presidential election came under question as
13 many organizations noticed irregularities with the results. *See* Central America's Violent
14 Northern Triangle; *see also* Honduras: Guarantee Credibility of Elections, Protect Free
15 Expression, HUMAN RIGHTS WATCH (Dec. 2017) (available at
16 https://www.hrw.org/news/2017/12/11/honduras-guarantee-credibility-elections-protect-free-
17 expression). Because of the instability and unrest within Honduras, the United States has issued
18 warnings cautioning travel there since 2012. *See* 2018 Crime & Safety Report. These travel
19 warnings are indicative of the safety concerns in the country and why many are fleeing in
20 hopes of creating more sustainable lives.
21        Gang violence is also responsible for the violence throughout Honduras. Since the
22 1990's, the United States has played a significant role in Honduran gang culture. *See* Gangs in
23 Honduras at 1. Mara Salvatrucha (MS-13), the 18th Street gang (M-18), and Barrio 18, three
24 gangs that originated in Los Angeles, are now three of the most prevalent gangs in the country.
25 *See* Clare Ribando Seelke, Gangs in Central America, CONG. RES. SER., 3 (Aug. 29, 2016)
26 (available at https://fas.org/sgp/crs/row/RL34112.pdf); *see also* Gangs in Honduras at 1. These
27 gangs expanded into Honduras after the United States passed legislation in 1996 that led to the
28 deportation of many undocumented immigrants with criminal records. *See* Gangs in Honduras

4

1  at 1. Although sources vary as to how many gang members are currently active, estimates
2  range between 5,000 to 36,000 members. *Id.* at 7. These U.S.-based gangs, along with local
3  gangs, use extortion and violence to control territories and comminutes. *See* Crime and
4  Violence at 1-2; *see also* Rocio Cara Labrador & Danielle Renwick, Central America's Violent
5  Northern Triangle, COUNCIL ON FOREIGN REL. (June 26, 2018) (available at
6  https://www.cfr.org/backgrounder/central-americas-violent-northern-triangle) [hereinafter
7  Central America's Violent Northern Triangle]. As a result, life in Honduras is tenuous, and
8  violence is a primary reason why many people, including Mr. Luisa-Ortega, flee the country in
9  order to find a life where they can be safe and find economic opportunity. *See* Central
10 America's Violent Northern Triangle.

11 Upon arrival in the United States, Mr. Luisa-Ortega was vulnerable to involvement in
12 drugs because of his trauma, lack of education, extreme poverty, and exclusion from lawful
13 employment. Mr. Luisa-Ortega did begin using drugs. First just marijuana, then experimenting
14 with methamphetamines. Drugs is what brought Mr. Luisa-Ortega to the Tenderloin. The
15 Tenderloin has been a hub of drug activity long before Mr. Luis Ortega was born and,
16 unfortunately, likely will be long after he is deported.[1] In his addiction and desperation, he did
17 make the regrettable decision to sell drugs. As reflected by his record, Mr. Luisa-Ortega made
18 this decision repeatedly. Yet, Mr. Luisa-Ortega was still just barely making ends meet, often
19 couch-surfing or living on the street and supporting his drug habit, while still scrounging
20 together a couple hundred dollars each month to send back home. While culpable for his
21 decisions, Mr. Luisa-Ortega's background, his addiction, and the desperate situation he found
22 himself in mitigates the need for a sentence greater than time served.

---

[1] Despite the government's attention to the location of Mr. Luis Ortega's sales being near school zones, this fact of course had nothing to do with Mr. Luis Ortega's decision to sell there—Mr. Luis Ortega sold drugs in the Tenderloin because this is where drugs are sold. There is no indication that Mr. Luis Ortega even knew these school zones existed when he sold $16 of base cocaine to an undercover officer.

## II. Adequate Deterrence is Accomplished with a Sentence of Credit for Time Served

The government has argued that a guidelines sentence of six months is appropriate to serve as personal and general deterrence. Mr. Luisa-Ortega respectfully responds that the sentencing guidelines of 6-12 months do not take into account the ultimate deterrence in this case—deportation. Furthermore, the three months Mr. Luisa-Ortega has spent at Santa Rita Jail, a notoriously difficult jail, have sufficient deterrent value.

This will be the first time Mr. Luisa-Ortega receives a federal sentence and faces deportation. After three months jail, immigration detention, and deportation, Mr. Luisa-Ortega will certainly be deterred from attempting to make the arduous journey north again to face what he knows will be even more severe consequences. Mr. Luisa-Ortega knows that an illegal re-entry after this deportation would be a new federal crime with severe penalties; this additionally deters both Mr. Luisa-Ortega and anyone else who faces these consequences.

Three months at Santa Rita, especially the three months Mr. Luisa-Ortega has been there, is a significant punishment. Defendants routinely request to go to sentencing as soon as possible just to escape the conditions at Santa Rita in favor of a federal prison. Furthermore, the past few months have been especially onerous at Santa Rita. The jail, too, is experiencing the weight of the additional defendants brought by FITT, a disproportionate number of which have remained detained because of their lack of ties to the community. Mealtimes are unpredictable, with the meals themselves meager, oftentimes consisting of two pieces of bread with one slice of ham. Inmates have also reported vermin and insects on food. A hunger strike intended to protest the conditions made circumstances worse for some inmates, like Mr. Luisa-Ortega. Inmates who did not want to participate were forced to by their more violent peers. For some, the hunger strike was bearable, because they could eat food bought from the commissary, without breaking the strike. Mr. Luisa-Ortega, however, has no money of his own and no loved ones who can afford to put money on his books, so he was left hungry, relying on the pity of other inmates for food. For this same reason, Mr. Luisa-Ortega can no longer speak to his mother daily, as he did before his arrest. The calls at Santa Rita are more expensive than at other facilities, and he can rarely make calls to connect himself to the outside world, again relying on the gratuity of other inmates.

Medical attention is hard to come by and, when received, woefully inadequate. Cleanliness is entirely forgotten; bunks and pods are filthy, yet inmates' requests for cleaning supplies go unanswered. By the report of one client, even toilet paper became hard to come by. Even with Mr. Luisa-Ortega's brutal past, he will not forget the three months he has spent at Santa Rita, and they are sufficient to deter him from future crimes.

**III.  Given the Kinds of Sentences Available for Mr. Luisa Ortega, A Sentence of Credit for Time Served Would Avoid Unwarranted Sentencing Disparities Among Similarly Situated Defendants (18 U.S.C. § 3553(a)(6))**

As none of the preferable alternatives to imprisonment expressly recognized by the U.S. Sentencing Guidelines based upon the Zone B guideline range here are available for Mr. Luisa-Ortega, the Court should instead vary downward under the factors of § 3553(a) to a term of imprisonment of "time served."

Additionally, the unusual consequence of deportation mitigates the amount of imprisonment necessary to punish as compared to other defendants. See *Jordan v. De George*, 341 U.S. 223, 232 (1951) (Jackson, J.) (deportation is "a life sentence of banishment in addition to the punishment which a citizen would suffer from the identical acts.")

**CONCLUSION**

For the aforementioned reasons, the Court should sentence Mr. Luisa-Ortega to a term of imprisonment of "time served," effectively three months imprisonment.

Respectfully submitted,

Dated:  January 2, 2020

STEVEN KALAR
Federal Public Defender
Northern District of California

/S
SOPHIA WHITING
Assistant Federal Public Defender